# United States Court of Appeals
# For the First Circuit

No. 04-1944

MICHAEL J. GILL,
Plaintiff, Appellee,

v.

GULFSTREAM PARK RACING ASSOCIATION, INC.; SCOTT SAVIN,
Defendants,

ANTHONY F. OTERO; THOROUGHBRED RACING PROTECTIVE BUREAU,
Interested Parties, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

Before

Boudin, Chief Judge,
Selya and Lynch, Circuit Judges.

Alan R. Hoffman, with whom Dale C. Kerester, Lynch, Brewer, Hoffman & Fink LLP, Peter S. Cowan, and Sheehan Phinney Bass + Green, Professional Association, were on brief, for appellants.
Steven M. Gordon, with whom Arpiar G. Saunders, Jr., James D. Rosenberg, and Shaheen & Gordon, P.A., were on brief, for appellee.
Michael J. Liston, Norman I. Barron, and Barron Peck Bennie & Schlemmer on brief for Association of Racing Commissioners International, amicus curiae.

March 7, 2005

**LYNCH**, <u>**Circuit Judge**</u>. This case raises the question of recognition of an informant's privilege and the associated public interests which underlie the privilege. The issue comes to us on arguments from a third-party investigative arm of an association of private race tracks, that the district court, under Fed. R. Civ. R. 26, erred in failing to recognize those interests when it ordered disclosure of the identities of informants who told of illegal activities by the plaintiff. We vacate the order and remand.

**I.**

Michael J. Gill, an owner of thoroughbred race horses, filed a false light defamation action against a Florida race track, Gulfstream Park, and the race track's president, Scott Savin, in New Hampshire federal court, based on diversity jurisdiction.

The case alleged defamation from statements by the Gulfstream defendants to reporters for Sports Illustrated magazine, which published an article about allegations that Gill had engaged in illegal horse racing practices. The relevant state racing agency, the Florida Division of Pari-Mutuel Wagering (FDPMW), in fact had investigated Gill. Gill claims that the defendants misrepresented the status of the investigation.

Gill learned during discovery about an Investigative Report on his horse racing practices which had been prepared by the appellants, the Thoroughbred Racing Protective Bureau (TRPB) and

one of its investigators, Anthony Otero. Neither are parties to the defamation case.

Gill then amended the complaint to assert that TRPB acted as the Gulfstream defendants' agent in preparing this defamatory Report. Gill did not seek then to add Otero or TRPB as parties. Gill subpoenaed TRPB's files concerning the investigation. TRPB's counsel declined to produce certain documents containing the names of the informants on grounds of privilege and confidentiality, but then inadvertently disclosed the documents with the names of these informants to Gill's counsel. Gill's then-counsel revealed the informants' names to his client, filed the documents containing the names under seal with the district court, and withdrew from the case.

Gill's successor counsel filed a motion to unseal and to use the inadvertently disclosed names, which was opposed by TRPB. TRPB sought a protective order, arguing that the names of the tipsters were protected from disclosure, under Fed. R. Civ. P. 26(c), by the informant's privilege under state law, and by other interests. The district court granted the motion to unseal and denied TRPB's request for a protective order. It did not reach the question of waiver of privilege through inadvertent disclosure.

TRPB filed an interlocutory appeal, arguing that the informant's privilege does attach and in any event the district court erred in not considering, for Rule 26 purposes, the public

interest in encouraging informants to divulge information about horse racing corruption to the industry watch dog group and the corresponding interests of the informants in confidentiality and privacy.[1]

## II.

TRPB, one of the third-party appellants in this case, describes itself as "the self-regulatory arm of the Thoroughbred Racing Associations of North America, Inc. ('TRA'), a non-profit trade association of the major thoroughbred race tracks in the United States and Canada."  The stated mission of TRPB is to "assure the security of thoroughbred racing participants and spectators and the integrity of thoroughbred races by working in close conjunction with civil and criminal enforcement authorities at every level of government, federal, state and local, to investigate allegations of wrongdoing at TRA member tracks, including criminal law violations."

---

[1]TRPB's appeal is supported by a brief from the Association of Racing Commissioners International (ARCI) as amicus curiae.  The regular members of ARCI are the racing commissioners from twenty states and six territories or countries.  State racing commissions, according to ARCI, are "established under the laws of the various States which conduct pari-mutuel racing to supervise and regulate pari-mutuel enterprises in the State.  The U.S. based Commissioners whom ARCI represents are State appointees and/or employees."  ARCI also has associate members, who are industry-related groups and regulatory groups from foreign countries.  TRPB is an associate member.  The ARCI's purpose is to "encourage a forceful regulation of North American (and international) racing and wagering for the protection of the sport, the contestants and the public."

In January 2003, TRPB began to investigate plaintiff Michael J. Gill, an owner of thoroughbred race horses, and Gill's horse trainer and veterinarians. At that time, Gill's horses were winning a high percentage of races at Gulfstream Park in Hallandale Beach, Florida, owned by Gulfstream Park Racing Association, Inc. In early January, an unnamed, confidential tipster had alerted Anthony Otero, an investigator with TRPB, of "suspicious" activity at the barn of Gill's trainer, specifically that "stable employees were being posted at the barn as lookouts during pre-race medication time." Otero also spoke with other unnamed, confidential tipsters (Gill claims that there were in total three separate tipsters), who told of other suspicious activities involving Gill's horses at Gulfstream and its satellite training facility. For example, the tipsters told TRPB that Gill's horses were being shipped to a nearby trotting center where they received "Extracorporeal Shock Wave Therapy" (ESWT) "four days out" from a race; Gulfstream's 2003 rules made a horse receiving ESWT treatment ineligible to start in a race until more than seven days post-treatment have elapsed. The tipsters also said that one of Gill's veterinarians was "blocking the joints" of Gill's horses on race day with a pain killer.[2] Further, the tipsters told Otero that on race days, Gill's trainer administered to the horses a "hormone

---

[2]"Blocking the joints" means injecting (illegal) pain killer medication into the horses' leg joints to enable them to run faster.

that stimulates and regulates red blood cell production thus infusing a system with a richer supply of oxygen." After receiving this information, Gulfstream's track veterinarian decided that if any of Gill's horses had to be euthanized following injury, fluids should be drawn from the joints for testing and a necropsy performed.

On February 3, 2003, one of Gill's horses, "Casual Conflict," injured its right front leg during a race and had to be euthanized. The injured part of the horse's right front leg was amputated and was oddly missing by the time Gulfstream's track veterinarian arrived to draw fluids from it for testing. The missing right front leg was later retrieved from one of Gill's veterinarians, who admitted to having removed it without permission.

On February 5, the FDPMW chief investigator contacted Otero and other TRPB personnel to advise them that the agency was taking over the investigation into the horse's death. The FDPMW taped interviews of Gill, his trainer, and veterinarians. Otero was present during most of these interviews. At least three conflicting explanations were given by the interviewees for why the leg of the horse was removed. FDPMW investigators then took some leg tissue from the horse for testing. The testers could not draw joint fluid for testing, but the other tests revealed no banned substances.

It was not uncommon for TRPB and the FDPMW to cooperate in investigations, and Otero and the FDPMW's investigators stayed in contact during the subsequent investigations. TRPB continued to investigate, presumably in cooperation with the FDPMW, and to watch for suspicious activity as to Gill's other horses. TRPB also conducted searches of the veterinarians' vehicles, which FDPMW investigators witnessed. One of Gill's veterinarians was then excluded from Gulfstream for failing to comply with DEA regulations, and another veterinarian was not allowed to practice medicine there for failing to sign the Gulfstream waiver of liability agreement.

On March 4, 2003, TRPB issued an Investigative Report on the Gill investigation to TRPB personnel, to some race track members of the TRA (including Gulfstream and Savin), and to the FDPMW. It is not clear how it was determined who would be on the distribution list. The Report included the allegations provided by the unnamed, confidential informants that Gill and his staff engaged in illegal or improper pre-race treatments of the horses. As Gill reads the Report, the investigation did not uncover evidence to confirm these alleged illegal or improper activities. But there was some evidence of improper activity in the Report.[3]

_____

[3]The Investigative Report did contain evidence that Gill's barn was involved in administering an illegal "milkshake" to one of Gill's horses. An illegal "milkshake" "masks the buildup of lactic acids in a horse causing the animal to run even though it is very tired." The Report also concluded that Gill's grooms acted as

The state agency's investigation into Casual Conflict's death ultimately closed without producing any administrative charges against Gill's trainer. However, the FDPMW did refer the cases regarding Gill's veterinarians to the Florida agency overseeing veterinarian licenses and the FDA.

On March 10, 2003, Sports Illustrated magazine published an article titled "Nagging Questions" about Gill's "unprecedented success" at Gulfstream and the suspicions surrounding that success. Savin, the president of Gulfstream, was quoted in the article, commenting on Gill's success: "[I]t's like Mark McGwire. People thought, He must be on steroids. Anytime somebody's doing something that's never been done before, it's a source of conspiracy theories."

**III.**

The procedural history was given earlier. We turn to the arguments made to the district court on the discovery motions.

---

lookouts and tried to misdirect the investigator away from the scene of possible illegal activity. The Report further observed that the equine clinic close to the training facility for Gill's horses offered ESWT among other therapeutic treatments, and that the veterinarian who administered these treatments was not licensed by FDPMW and was not under regulatory oversight; however, the Report did not contain any confirmed instance of Gill's horses being transported to the clinic to receive ESWT during the surveillance period from February 5 to February 17, 2003. The Report noted that Gill's trainer and veterinarians had previously been the subjects of other TRPB investigations and had been fined or suspended for periods of time for illegal horse racing practices.

TRPB made a number of arguments.  First, TRPB argued that it had good reason to keep the identities of the tipsters confidential.  TRPB's investigations supported the public interest in law enforcement and the fairness and integrity of the thoroughbred racing industry, and confidentiality of the informants' identities was necessary for TRPB's work.  TRPB investigators often rely upon information provided by tipsters whose identities are kept confidential.  "In order to protect the privacy rights of such individuals and to further the public interest in law enforcement by facilitating communications from such individuals, TRPB's notes and file information underlying its reports are never released to any party.  Absent the protection of such confidentiality, TRPB would be unable to conduct meaningful investigations."

Second, TRPB argued it was entitled to a protective order under Fed. R. Civ. P. 26.  TRPB maintained that the balancing of interests required by the Rule favored the protective order because Gill's asserted interests in the identities of the confidential tipsters were outweighed by the public interest in the fairness and integrity of the races, TRPB's interest in its ability to protect that public interest by maintaining the confidential identities of its informants (characterized as an "informer's privilege" or "informant's privilege"), and the privacy interests of the informants themselves.  On the matter of the existence of a

privilege, TRPB argued that Florida privilege law, rather than New Hampshire's, should govern the privilege analysis and whether the privilege was waived in this case.  Under that analysis, the privilege was not waived and the sealed documents should not be disclosed.  But even if New Hampshire law or "federal common law" were to apply, TRPB argued that the result would be the same.

Gill, in turn, argued that the documents should be unsealed because TRPB could not meet the burden of showing that an "informant's privilege" applied to the documents at issue.  Gill argued that the applicable law was New Hampshire law, which affords no such privilege to a private entity such as TRPB.  Even assuming that a privilege existed, TRPB waived it through the disclosure to Gill's former counsel.  Disclosure of the identities of the tipsters, Gill argued, was "central to [his] defamation claim" because the information would help to resolve the questions of (1) "whether the tipsters [sic] statements were motivated by ill-will," (2) "whether the tipsters were agents of the defendants," and (3) "whether the tipsters had a business relationship with the defendants sufficient to motivate them to publish their defamatory statements to a private person knowing that publication of the statements would adversely affect plaintiff's business."

On June 21, 2004, the district court allowed Gill's motion to unseal and denied TRPB's motion for a protective order.  The district court found it unnecessary to resolve the choice of

law question because both New Hampshire and Florida law "recognize an informant's privilege in circumstances in which confidential information is provided to government entities in criminal and civil litigation."  However, the privilege did not apply to the context of "confidential information being provided to a non-governmental entity such as the TRPB," and "if the informant might be able to give information that would be relevant to a fair determination of a material issue in the case, the court may require disclosure."

The district court found the identities of the tipsters relevant because "the confidential informants would likely have information that would be relevant to a fair determination of whether [Gulfstream and Savin] used reasonable care in publishing the information about Gill that he claims was false and defamatory."  The district court then concluded: "No other privilege or reason to protect those documents from disclosure has been asserted. . . ."  Therefore, Gill's counsel "may use those documents in any appropriate manner."

TRPB timely filed a notice to appeal and moved to stay the June 21, 2004 order.  The district court stayed the order pending appeal.  This court initially required TRPB to show cause for why the appeal should not be dismissed for lack of jurisdiction.  After TRPB's response, this court allowed the appeal

-11-

to proceed and directed the parties to address appellate jurisdiction along with the merits in their briefs.

**IV.**

Interlocutory Appeal

Ordinarily, litigants may not seek immediate appeal of discovery orders because they are not final decisions and orders of the district court. See FDIC v. Ogden Corp., 202 F.3d 454, 458 (1st Cir. 2000). But, by refusing to comply with the discovery order, "the party resisting [it] 'can gain the right of appeal . . . by defying it, being held in contempt, and then appealing from the contempt order, which would be a final judgment as to [him].'" Id. at 459 (quoting Corporacion Insular de Seguros v. Garcia, 876 F.2d 254, 257 (1st Cir. 1989)) (alterations in FDIC). The requirement that appellants gain the right to appeal by disobedience followed by contempt "serves efficiency interests because it encourages reflection both by the party seeking discovery and by the party resisting it." Id.

One exception to the rule that an appellant must be held in contempt before appealing a discovery order exists where, as here, the documents being sought are not in the hands of the appellants (TRPB), but in the hands of a third party (sealed and filed with the district court). See, e.g., Perlman v. United States, 247 U.S. 7, 13 (1918). An exception in such circumstances is necessary because disobedience followed by contempt is not an

-12-

option for the would-be appellant when the discovery order is not directed at him, but at the third party, who "presumably lacks a sufficient stake in the proceeding to risk contempt by refusing compliance." Church of Scientology v. United States, 506 U.S. 9, 18 n.11 (1992).

Not all such discovery orders are immediately appealable, however, and "[s]ome tension exists in our precedents as to whether the availability of immediate review in cases such as this should be gauged by the Perlman rule or by the more encompassing Cohen collateral order doctrine." FDIC, 202 F.3d at 459; see Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546-47 (1949); Perlman, 247 U.S. at 13. Briefly stated, in this circuit, for a discovery ruling to be immediately appealable under the Cohen collateral order doctrine, an order must:

> (1) concern a collateral issue so conceptually distinct from other issues being litigated in the underlying action that an immediate appeal would neither disrupt the main action, nor threaten to deprive the appellate court of useful context which might be derived from subsequent developments in the litigation;
> (2) completely and conclusively resolve the collateral issue;
> (3) infringe rights which appellant could not effectively vindicate in an appeal after final judgment in the case; and
> (4) involve an important or unsettled legal issue, rather than merely challenge discretionary trial court rulings.

United States v. Quintana-Aguayo, 235 F.3d 682, 684 (1st Cir. 2000) (quoting United States v. Kouri-Perez, 187 F.3d 1, 5 (1st Cir.

1999)).  These requirements have been interpreted to be narrower than the broad statement of the Perlman rule that "a discovery order addressed to a non-party sometimes may be treated as an immediately appealable final order vis-à-vis a party who claims to hold an applicable privilege."  FDIC, 202 F.3d at 459.[4]

TRPB argues that appellate jurisdiction is appropriate under either the collateral order test or the Perlman rule.  We agree.  Despite the tension in the case law over whether (and the degree to which) the Perlman rule has been absorbed into or limited by the collateral order doctrine, this case qualifies for appellate review under both doctrines.

First, this appeal fits the classic Perlman mold: appellants are third parties; the district court is in possession of the documents and has ordered that the documents in question be unsealed and turned over to the plaintiff and his new counsel, who may "use those documents in any appropriate manner"; the appellants have no control over the documents, which have been filed with the court, and thus are "powerless to avert the mischief of the order," Perlman, 247 U.S. at 13; and unless immediate appeal is granted,

---

[4]The difference between Perlman and Cohen may be relevant in some cases because "the Perlman rule arguably contains no limitation on the scope of review, while review under the collateral order doctrine arguably is limited to 'clear-cut legal error' as opposed to challenges that seek to test either factual determinations or the application of a settled legal rule to the particular facts."  FDIC, 202 F.3d at 459 n.3.

-14-

the identities of the informants would become public knowledge, "rendering an end-of-case appeal nugatory," FDIC, 202 F.3d at 459.

Second, this appeal satisfies the four-prong test for the Cohen collateral order doctrine used in this circuit. The issue of whether the identities of the tipsters should remain protected is "conceptually distinct" from the invasion of privacy, defamation, and tortious inference claims. There is thus no danger that immediate appeal in this case would "engender repetitive review," the avoidance of which is the rationale for the "conceptually distinct" requirement. See Quintana-Aguayo, 235 F.3d at 685. The district court's order completely resolves the issue of whether the identities of the tipsters will be protected. As well, once the documents are turned over to Gill with no clear limitation on what he may do with them, the cat is out of the bag, and there will be no effective means by which TRPB can vindicate its asserted rights after final judgment. Finally, TRPB's argument is that the district court committed "clear-cut legal error." FDIC, 202 F.3d at 459 n.3 (quoting United States v. Billmyer, 57 F.3d 31, 35 (1st Cir. 1995)).

Gill, citing FDIC, 202 F.3d at 459-60, argues that circuit law requires that TRPB in this case raise a "substantial privilege claim" (emphasis added by Gill) to obtain immediate review under either Perlman or the Cohen collateral order doctrine. Since TRPB cannot point to any case law justifying the extension of

the government informant's privilege to private parties except for two cases, <u>Apex Oil Co.</u> v. <u>DiMauro</u>, 110 F.R.D. 490 (S.D.N.Y. 1985) and <u>Ross</u> v. <u>Bolton</u>, 106 F.R.D. 22 (S.D.N.Y. 1985), the argument goes, its appeal from the district court's order does not involve a substantial privilege claim, and this court has no jurisdiction. Under Gill's view, we must resolve the merits question in order to decide the appellate jurisdictional question.

This argument misreads <u>FDIC</u>. <u>FDIC</u> involved a subpoena duces tecum directed at a law firm, a non-party to the underlying contract dispute who had represented the interests of the defendant. <u>FDIC</u>, 202 F.3d at 457-58. The subpoena ordered the law firm to produce documents that the defendant asserted were protected by the attorney-client privilege. <u>Id.</u> at 458. After acknowledging that it was unclear under circuit law whether appealability should be measured by the <u>Perlman</u> rule or the collateral order doctrine, the <u>FDIC</u> court concluded that it was not necessary to answer that question in order to resolve jurisdiction: "Under either approach, a substantial privilege claim that cannot effectively be tested by the privilege-holder through a contemptuous refusal ordinarily will qualify for immediate review if the claim otherwise would be lost." <u>Id.</u> at 459-60. Read in context, the language Gill relies on makes a "substantial privilege claim" a <u>sufficient</u> but not a <u>necessary</u> condition for appealability under either the collateral order doctrine or the <u>Perlman</u> rule.

-16-

<u>FDIC</u> delineates one set of cases which may be immediately appealed under either approach but does not define all such cases.

It is not a requirement for interlocutory appeal of discovery orders conclusively determining third-party rights that the appellant assert a substantial, well-recognized claim of privilege. The <u>Perlman</u> doctrine requires only that the appellant have "<u>a significant interest</u> in the matters involved in the discovery order . . . . Claims of privilege are by far the most common, but a proprietary interest also may suffice." 15B Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 3914.23, at 156 (2d ed. 1991) (emphasis added).

Indeed, were Gill's argument correct, it would read out the fourth prong of the collateral order doctrine: that "important or unsettled legal issues" in discovery orders can qualify for review. In our view, the claims asserted here are both important and unsettled. The Supreme Court has explained that "important" in the <u>Cohen</u> collateral order doctrine sense means "being weightier than the societal interests advanced by the ordinary operation of final judgment principles." <u>Digital Equip. Corp.</u> v. <u>Desktop Direct, Inc.</u>, 511 U.S. 863, 879 (1994).

The appellants here, supported by an amicus brief from the Association of Racing Commissioners International, contend that an important public interest which may be irretrievably lost weighs against the disclosure contemplated by the district court's order.

-17-

This is just the sort of "important" legal question that immediate appeal under the collateral order doctrine is supposed to resolve. See FDIC, 202 F.3d at 460; see also In re Sealed Case (Medical Records), 381 F.3d 1205, 1210, 1216-17 (D.C. Cir. 2004) (noting that discovery order was appealable under either collateral order doctrine or Perlman and holding that district court erred by not engaging in Rule 26 balancing of the probative value of discovery order against privacy interests of the appellants); Montgomery Ward & Co. v. Zenith Radio Corp., 673 F.2d 1254, 1258 & n.6, 1259 (C.C.P.A. 1981) (asserting appellate jurisdiction under both the collateral order and Perlman doctrines over non-party corporation's appeal of trial court's order compelling government to disclose an investigative report containing confidential business information of the appellant; court expressly did not reach the "confidentiality of the . . . file or any applicable privilege" and stated that "the courts have not limited interlocutory appeals of discovery orders to those involving assertions of absolute or constitutional privileges"). We are satisfied that the minimum threshold for appellate jurisdiction has been met, and we turn to the merits.

**V.**

There are two orders at issue: the district court's allowance of the order to unseal and its denial of TRPB's request for a protective order. TRPB argues that the district court erred

in the protective order analysis because it was obligated to, and failed to, engage in balancing of Gill's interest in the identities of the confidential tipsters against TRPB's claims of informer's privilege, public interest privilege, and privacy rights. It follows that if the protective order analysis was flawed, then the order to unseal must also fall.

Fed. R. Civ. P. 26(b)(1) provides, "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . <u>All discovery</u> is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii)." <u>Id.</u> (emphasis added). Discovery of both privileged and unprivileged information may be limited by Rule 26(b)(2).[5]

---

[5]The final sentence in Fed. R. Civ. P. 26(b)(1) was added by the 2000 amendments to the rules to "emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery." <u>Id.</u> advisory committee note. Rule 26(b)(2), in turn, provides:

> The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule <u>shall be limited</u> by the court if it determines that: . . . (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. The court may act upon its own initiative after reasonable notice or pursuant to a motion under Rule 26(c).

Fed. R. Civ. P. 26(b)(2). The appellants filed their motion for a protective order under Fed. R. Civ. P. 26(c), which allows the district court, "for good cause shown, . . . [to] make any order

Under Rule 26, the trial court is required to balance the burden of proposed discovery against the likely benefit. See In re Sealed Case (Medical Records), 381 F.3d at 1214-17; Farnsworth v. Procter & Gamble Co., 758 F.2d 1545, 1547 (11th Cir. 1985); Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 596-97, 599 (1st Cir. 1980). The district court abuses its discretion in balancing the conflicting interests in discovery of confidential information "'when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment.'" In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1019 (1st Cir. 1988) (quoting United States v. Hastings, 847 F.2d 920, 924 (1st Cir. 1988)).

As we read the district court's order, it ruled that once it had decided there was no informant's privilege, it had no need to engage in any balancing of any other interests on the part of TRPB. Also, as we read the order, the court thought that the only interest asserted was a formal informant's privilege. We have

which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters." Fed. R. Civ. P. 26(c).

-20-

carefully reviewed the record and understand TRPB's arguments differently.

TRPB in fact struck at least three distinct themes: (1) the informant's privilege is applicable to TRPB; (2) maintaining the confidentiality of the tipster's identities is, in any event, in the public interest and implicates concerns of a much larger group of people than the parties to this suit; and (3) the confidentiality and privacy rights of the tipsters and the appellants weigh against disclosure. The district court's order addressed only the first argument and not the others, and so did not consider significant relevant factors.

## A. The Informant's Privilege

Since this case is a diversity suit involving only state-law claims, TRPB's claim that the documents here are protected by an evidentiary privilege is governed by state law under Fed. R. Evid. 501.[6] See 8 Charles Alan Wright et al., Federal Practice and Procedure § 2016, at 224 (2d. ed. 1994). The parties disagree over whether the privilege law of Florida or New Hampshire should govern

---

[6]"[T]he privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." Fed. R. Evid. 501.

-21-

the existence and scope of the privilege. Like the district court, we conclude that New Hampshire and Florida law are so similar on this point that there is no need to make a choice.

Both New Hampshire and Florida allow a government entity to assert a privilege not to disclose the identities of informers who provided information relating to violations of the law. See N.H. R. Evid. 509; Foster v. State, 816 So.2d 1177, 1178-79 (Fla. Dist. Ct. App. 2002); see also Roviaro v. United States, 353 U.S. 53, 59-60 (1957) (recognizing privilege under federal law). The privilege is applicable in both criminal and civil proceedings. See N.H. R. Evid. 509; In re Forfeiture of 1985 Dodge No. JB3BA24KOFU124494, 529 So.2d 767 (Fla. Dist. Ct. App. 1988). Usually, the privilege is limited to government officials. See generally Edward J. Imwinkelried, The New Wigmore: A Treatise on Evidence § 7.3.1, at 1051 (2002); 8 Wigmore on Evidence § 2374 (McNaughton Rev. 1961 & Supp. 2004). Neither New Hampshire nor Florida has ruled on whether a private entity in the position of TRPB may assert the privilege.[7]

---

[7]The appellants cite to two Southern District of New York cases, Apex Oil Co. v. DiMauro, 110 F.R.D. 490 (S.D.N.Y. 1985) and Ross v. Bolton, 106 F.R.D. 22 (S.D.N.Y. 1985), to support their argument that the informant's privilege should be extended to non-government entities. The parties resisting discovery in those two cases were organizations that were "statutorily assigned a significant responsibility, under the supervision of a federal agency, for policing industry practices and investigating possible illegal activity by its members." Apex Oil Co., 110 F.R.D. at 497; see Ross, 106 F.R.D. at 24 & n.1. TRPB does not claim that it has statutorily assigned duties.

We note that the private/public investigative agency distinction is not perfect. It appears from the record that TRPB shared its investigation with the appropriate state investigative agency and that agency relied on the information in its investigation. It seems clear that if the tipsters had gone directly to the state agency, rather than through the private watch dog group first, the informant's privilege would apply.

In fact, Florida law explicitly provides that FDPMW may keep secret from the public "active criminal intelligence or criminal investigative information . . . and any other information that, if disclosed, would jeopardize the safety of an individual." Fla. Stat. § 550.0251(9). "Criminal investigative information" includes "information derived from laboratory tests, reports of investigators or informants, or any type of surveillance" during the course of a criminal investigation. Id. § 119.011 (emphasis added).

Neither Florida nor New Hampshire has to date addressed the question we face: application of the informant's privilege to an industry self-regulatory investigative agency which cooperates with a state investigative agency. As such, appellants have failed to show that the documents are covered by the formal informant's privilege under state law. A federal court sitting in diversity cannot be expected to create new doctrines expanding state law. See A. Johnson & Co. v. Aetna Cas. and Sur. Co., 933 F.2d 66, 73

n.10 (1st Cir. 1991). But the Rule 26 inquiry does not end there. That there is no informant's privilege does not mean there are no interests of the public or other persons involved in the balance.

B.  TRPB's Other Arguments for a Protective Order

Evidentiary privileges formally recognized by state law are not the only relevant factors in the Rule 26 balancing act. "Rule 26(c) is highly flexible, having been designed to accommodate all relevant interests as they arise. . . . [T]he 'good cause' standard in the Rule is a flexible one that requires an individualized balancing of the many interests that may be present in a particular case." United States v. Microsoft Corp., 165 F.3d 952, 959-60 (D.C. Cir. 1999).

In particular, considerations of the public interest, the need for confidentiality, and privacy interests are relevant factors to be balanced. See, e.g., Seattle Times Co. v. Rhinehart, 467 U.S. 20, 35 n.21 (1984) ("Although . . . Rule [26(c)] contains no specific reference to privacy or to other rights or interests that may be implicated, such matters are implicit in the broad purpose and language of the Rule."); In re Sealed Case (Medical Records), 381 F.3d at 1215 (interests in privacy should be taken into account in the Rule 26 analysis, even when "the information sought is not privileged"); Ellison v. Am. Nat'l Red Cross, 151 F.R.D. 8, 11 (D.N.H. 1993) (balancing public interest in protecting

-24-

the nation's blood supply against litigant's interest in discovering the identity of blood donors).

The district court has already recognized that Gill has some interest in discovering the identities of the informants, having accepted Gill's argument that the informants would likely have information relevant to whether defendants were reckless in their publication. Gill relied on Downing v. Monitor Publishing Co., 415 A.2d 683 (N.H. 1980). The appellants reply that they were not agents of the defendants.

It is not our province to weigh Gill's interests (including ones he has argued for the first time on appeal), much less to balance these interests against the appellants' asserted interest, shared by the public, in protecting the integrity of racing and, as well, the privacy interests of the informants. It is enough that the law is clear that the latter two interests are recognized and must be weighed, in the first instance, by the district court.

In short, we think the district court should have a fresh opportunity to evaluate the competing interests, as contemplated by Rule 26. We recognize that the district court has the best vantage point from which to perform this balancing, and we intimate no view as to the outcome. We **vacate** its orders and **remand** for proceedings consistent with this opinion. No costs are awarded.