In re Jack C. BENUN, Debtor.

Fuji Photo Film Co., Ltd., Plaintiff,

v.

Jack C. Benun, Defendant.

Bankruptcy No. 03–32195(MS).

Adversary No. 03–2615(MS).

United States Bankruptcy Court, D. New Jersey.

March 10, 2006.

Bruce Buechler, Esq., Lowenstein Sandler PC, Roseland, NJ, Matthew W. Siegal, Esq., Stroock, Stroock & Lavan, LLP, New York, NY, for Fuji Photo Film Co., Ltd.

Joseph L. Schwartz, Esq., Riker Danzig, Morristown, NJ, for Defendant, Jack C. Benun.

Warren A. Usatine, Esq., Cole, Schotz, Meisel, Forman & Leonard, PC, Hackensack, NJ, for Brian T. Moore, Liquidating Trustee.

## OPINION

MORRIS STERN, Bankruptcy Judge.

### I. *Background.*[1]

Fuji Photo Film Co., Ltd ("Fuji") seeks to depose Jeffrey I. Kaplan, Esq. ("Kaplan"), and to require production of certain documents from his file, in connection with his representation of Jazz Photo Corp. ("Jazz"). Kaplan also represented Jack C. Benun ("Benun"), at times jointly with Kaplan's representation of Jazz. Jazz, a Chapter 11 debtor, is presently under the control of Brian T. Moore ("Moore"), as liquidating trustee. Benun is currently a debtor in a Chapter 7 bankruptcy case. In immediate dispute are knotty attorney-client privilege issues.[2]

1. Related reported decisions include: *Jazz Photo Corp. v. United States*, 439 F.3d 1344 (Fed.Cir.2006), *affirming* 353 F.Supp.2d 1327 (Ct. Int'l Trade 2004); *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368 (Fed.Cir.2005), *affirming* 249 F.Supp.2d 434 (D.N.J.2003); *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094 (Fed.Cir.2001); and *In re Jazz Photo Corp.*, 312 B.R. 524 (Bankr.D.N.J.2004).

2. Fuji seeks, among other documents in Kaplan's possession, those "which, in whole or in part, can be considered to impeach the truthfulness of statements, testimony or written representations of Benun," as well as Kaplan's deposition testimony that Benun's claims "of good faith," including such claims "in ... proceedings" relating to the infringement of Fuji's patents, "were untrue." Fuji senses that if this court orders such production and testimony, Mr. Kaplan, as a recently turned antagonist of Mr. Benun, would become an invaluable discovery source. *See*

This adversary proceeding has a near decade-long history, with Benun and Jazz being pursued by Fuji for patent infringement. Fuji seeks to deny Benun a discharge and to except from any bankruptcy discharge (if one should issue) its claims against Benun. Fuji's claims to exception to discharge are (now) based upon 11 U.S.C. § 523(a)(6) ("willful and malicious injury ... to property...."). Denial of discharge would be grounded in 11 U.S.C. § 727(a)(2)(3) and (5) (transfer, etc. of estate property, failure, etc. to keep records, and failure to explain loss of assets).

Jazz, in liquidation following confirmation of a liquidating plan, had been a corporation whose stock was owned by Benun's family but which operated under his control. Kaplan is a patent lawyer whose representation of *both* Benun and Jazz, variously, was in an array of litigation, regulatory/enforcement proceedings and appeals over the period of this odyssey. The Benun–Jazz–Fuji litigation trail, in summary form for present purposes, began with a Fuji-prompted investigation by the International Trade Commission ("ITC–I"). On June 28, 1999 the ITC adopted an administrative finding that the importing and sale of certain "Lens–Fitted Film Packages" (disposable cameras referred to as "LFFPs") by Jazz and a number of other importers violated Fuji's patents. The Commission issued a General Exclusion Order and Order to Cease further infringement of Fuji's patents (hereinafter the "Cease and Desist Order"). Jazz (not Benun) and others appealed to the Federal Circuit ("Appeal I"). In significant part, the appeal centered on what

manner of refurbishment of Fuji-patented disposable camera shells would be an allowable "repair," as distinguished from an infringing "reconstruction." Meanwhile, immediately on the heels of the 1999 ITC–I decision, Fuji sued Jazz, its Hong Kong subsidiary *and Benun* in an infringement/damage action in the District Court for the District of New Jersey ("District Court I"). The chronology of these three matters is:

- ITC initial investigation (ITC–I)—March 18, 1998 to June 28, 1999;
- Fuji District Court patent suit (District Court I)—June 23, 1999 to March 18, 2003 (judgment date); and
- Appeal of ITC–I to Federal Circuit (Appeal I)—September 28, 1999 to August 21, 2001 (decision date).

Kaplan was counsel to Jazz in ITC–I and Appeal I, and counsel (along with co-counsel) to Jazz and Benun in District Court I.

Appeal I resulted in a lengthy opinion and, in effect, a manual of "how to" refurbish LFFPs so that the affirmative defense of "repair" could be advanced by Jazz and others.[3] There was a remand to the ITC for implementation of the decision, which, in turn, generated a request for comment by the ITC. On January 10, 2002 Kaplan responded for Jazz; Fuji's January 16, 2002 response included a request for an enforcement proceeding (as to the earlier Commission Cease and Desist Order), targeting not only Jazz, *but also* Benun and Jazz's then president (Cossentino). Thus, Fuji alerted Kaplan (and the ITC) on January 16, 2002 to Fuji's intention to put Benun in further jeopardy,

Fuji proposed form of discovery order, Docket entry 56 part 3.

**3.** The Federal Circuit reversed the ITC judgment of patent infringement "with respect to LFFPs for which the patent right was exhausted by first sale in the United States and

that were permissibly repaired." *Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d at 1110. The "first sale *in the United States*" (emphasis added) requirement has taken on overriding significance in subsequent volumes of the Jazz–Benun–Fuji tome.

beyond the then pending District Court I infringement action in which Kaplan had appeared for both Jazz and Benun. On September 24, 2002 the ITC did, in fact, accede to Fuji's request by initiating an enforcement proceeding against Jazz, Benun and Cossentino ("ITC–II"). Kaplan dutifully appeared on behalf of Jazz and Benun in ITC–II, and represented them throughout that proceeding, which concluded on or somewhat after January 14, 2005.

District Court I, long stayed pending the Federal Circuit's decision in Appeal I, resulted in a near $30 million judgment against Jazz, its Hong Kong subsidiary and Benun, jointly and severally. The judgment of March 18, 2003 (covering infringement only through the date of the decision in Appeal I, August 21, 2001) propelled Jazz and Benun into this court. Jazz filed a Chapter 11 petition on May 20, 2003, and Benun filed a like petition on July 2, 2003.

The judgment in District Court I was then appealed to the Federal Circuit by counsel other than Kaplan (Notice of Appeal filed April 9, 2003, "Appeal II"). However, on April 22, 2003 Kaplan filed a declaration in support of a stay pending appeal on behalf of both Jazz and Benun. Ultimately, on January 14, 2005 the judgment against Benun and Jazz was affirmed.

ITC–II was initially stayed by the bankruptcies. Eventually, the stays were lifted *and* Kaplan was authorized by this court to continue to represent both Jazz and Benun in that enforcement proceeding. Things went badly there for the debtors. On July 27, 2004 the ITC adopted administrative findings that Jazz, with Benun's complicity, had again infringed Fuji's patents (now, after August 21, 2001). On the day of the Federal Circuit's January 14, 2005 affirmance (Appeal II), the ITC levied a $13,675,000 penalty (for violation of the 1999 Cease and Desist Order for the August 21, 2001 through December 12, 2003 period), jointly and severally, against Jazz and Benun. This amount is due the United States government; however, Fuji has filed claims in the Jazz and Benun bankruptcies based upon the ITC findings. The ITC–II penalty was appealed, again to the Federal Circuit ("Appeal III"), on *Benun's behalf* (only) by Kaplan. Appeal III is pending.[4]

Eventually, Jazz was rendered subject to liquidation (an ongoing post-confirmation process) and Benun's individual Chapter 11 case was converted. Jazz's liquidation plan was confirmed by an Order of May 13, 2005, and Benun's case was converted to one in Chapter 7 on March 11, 2005.

On or about May 16, 2005, Moore, Jazz's liquidating trustee, initiated a legal malpractice case against Jazz's lawyers (including Kaplan) for their alleged errors in defense in District Court I. After being removed from state court and "stopping off" in this court long enough to allow this court some limited insight into the claims,

---

4. In a related branch of Jazz–Benun–Fuji fisticuffs, certain containers of LFFPs were denied entry into the United States by U.S. Customs in August 2004. Customs acted pursuant to the ITC's Cease and Desist Order. Jazz challenged Customs by application of October 4, 2004 to the Court of International Trade. That court tried the dispute (between the United States government and Jazz, to the exclusion of would-be intervenor Fuji), in November 2004. Some (but not all) LFFPs were deemed to have been established as compliant with the affirmative defense of first sale/permissible repair announced by the Federal Circuit, and were thus released into the United States. The United States appealed; on February 28, 2006, the Federal Circuit affirmed the decision of the Court of International Trade. *Jazz Photo Corp. v. United States*, 439 F.3d 1344 (Fed.Cir.2006).

this case moved (via withdrawal of the bankruptcy reference) to the District Court ("District Court II"). At some point during the pendency of District Court II, Benun, a nonparty, provided plaintiff Moore with a declaration. It alleged that Benun had requested that a certain legal theory be advanced in District Court I (based upon the view that Appeal I announced "new law" in requiring "first sale in the United States" as a prerequisite to the affirmative defense of permissible repair, and that the requirement should not have been applied retroactively in District Court I). Benun's alleged advice or request was said to have been ignored. Appeal II would not address the issue, deeming it to be waived as not having been raised in District Court I.

Kaplan, taking umbrage and seeking (in the name of his law firm, "KGGD") to be relieved as Benun's counsel in Appeal III, advised the Federal Circuit in November 2005, as follows:

> Here, withdrawal is mandated under Rule of Professional Conduct 1.7 because the representation of Benun in this appeal will be "materially limited . . . by the lawyer's own interests." KGGD will be introducing specific documents, and specific testimony, which will refute the declaration that Mr. Benun has submitted in the malpractice action. . . . Those documents and that testimony, much of which represents previously privileged communications between Mr. Benun and/or his former company, Jazz Photo Corp., and KGGD as counsel, will most definitely undermine the truthfulness and good faith of Mr. Benun, and will have a detrimental effect on Mr. Benun's rights in this Appeal on several other issues. . . . Indeed, KGGD is reluctant to disclose those specific documents and testimony presently for full consideration by this Court now, as mere disclosure of them

would have a detrimental impact on Mr. Benun's rights. However, counsel believes that there are specific arguments to be made in this appeal that will be undermined and indeed refuted by the privileged information that KGGD will likely be submitting in the malpractice action, and by the arguments it will be making there, to refute Benun's declaration. . . .

Siegal Declaration, Docket Entry 46, Ex. 2 at 3. Thus, in a forum where review of Benun's good faith effort to comply with the ITC Cease and Desist Order was a prominent issue, Kaplan signaled that privileged documents and his testimony would be *contra.* Fuji, of course, quickly picked up on the attorney-client schism and the potential for proofs as to Benun's lack of good faith. Fuji's obvious hope is to use Kaplan's file and testimony to establish Benun's "willful and malicious" infringement of its patents for exception to discharge purposes in the immediate adversary proceeding.

This adversary proceeding was initiated by complaint filed on October 7, 2003. The case has moved slowly through discovery and motion practice. Now that trial is approaching, motion practice has intensified, including recent cross-summary judgment motions. These motions resulted in the excising of one of Fuji's causes (as to 11 U.S.C. § 523(a)(4)) and denial of the balance of both parties' motions.

The summary judgment cross-motions made it clear that Benun's conduct and state of mind (including the issues of "willful" and "malicious" injury per § 523(a)(6)) had to be addressed in specific blocks of time running from before the decision in District Court I, through interim points as marked by, e.g., the ITC–I determination, to the ITC–II determination (and perhaps beyond).

By motion filed on shortened notice on January 26, 2006, Fuji, apparently energized by the recently developed split between Kaplan and Benun, sought access to Kaplan's files and to Kaplan as a deposition witness. The motion, heard on February 6, 2006, espoused three theories: that Benun, in asserting in discovery that he was or might be relying on early 1990's advice of counsel (*not* Kaplan) to a now-defunct camera company controlled by Benun, opened the "advice-of-counsel" door; that *Jazz's* legal malpractice suit against Kaplan had broadly stripped away Jazz's privilege (and presumably Benun's); and, that in a December 2005 document discovery session in Trustee Moore's offices, a significant letter from Kaplan to Jazz's president—not Benun—was discovered by Fuji's counsel. That letter was dated February 15, 2002 and, in most general terms, expressed Kaplan's view of "potential 'holes' in our compliance" with the ITC's 1999 Cease and Desist Order, as impacted by the Appeal I decision of August 21, 2001. This court reviewed the letter and has readily concluded that it was legal advice of an extremely sensitive nature based in large part upon Kaplan's opinion.[5]

Moore and Fuji disagreed fundamentally as to the December 2005 discovery ground rules. (Fuji was engaging in discovery in yet another case—its action against *Ribi Tech*, a newly formed corporation owned by the Benun family and the current employer of Benun.) Moore contended that the February 15, 2002 letter was inadvertently made available in and among more than seventy-five boxes of Jazz documents he had just moved to new quarters (after closing down the Jazz facility), *and* that there had been an understanding with Fuji's counsel that no attorney-client privilege was being waived by Moore in extending to Fuji the courtesy of document review. Fuji's counsel saw things differently. More generally, Moore and Fuji's counsel disagreed on the scope of waiver of the attorney-client privilege effected by Moore's malpractice suit against Kaplan.

It is apparent to this court that the Trustee did not intend to waive any aspect of Jazz's attorney-client privilege by permitting Fuji to review documents, nor did/does Moore believe that the effort to maximize assets in liquidation through the malpractice suit broadly waived that privilege. Nevertheless, as to the February 15, 2002 letter inadvertently left available for discovery, the Trustee did not choose to spend estate assets in expensive litigation with Fuji; by letter agreement of January 23, 2006, Moore (not "having a dog" in the Fuji–Benun fight) agreed with Fuji as follows:

> In the interest of our continuing cooperation with Fuji ... in this matter, including its continuing discovery efforts, I provided Fuji representatives access to certain Jazz documents and information in both hard copy and electronic form. I did so with the express understanding that Fuji's inspection would not effect a waiver of the attorney-client or attorney work product privileges with regard to any of those materials. You have disputed that we had such an understanding with regard to Fuji's review of the documents in

---

5. It is clear that, at the time this letter was written, Fuji was pressing the ITC to begin an enforcement action against not only Jazz but also Benun, and that Kaplan had already appeared for Benun in District Court I, the infringement trial which had been stayed pending the decision in Appeal I. The enforcement action was, in fact, initiated on September 24, 2002. Benun and Jazz were named respondents. The infringement trial went forward on October 24, 2002.

Jazz's office that existed in hard copy form. *Our disagreement on that point notwithstanding, and even assuming we had no such agreement for those hard copy documents, any disclosure of privileged material to Fuji was inadvertent and cannot form the basis of a claim that any privilege has been waived.*

. . .

As you are aware, the Liquidation Trust is currently pursuing the above mentioned malpractice claim against the Kaplan & Gillman and Dreier firms relating to their handling of the patent infringement trial before Judge Hochberg. This matter is being pursued for the benefit of creditors. I have been advised that under applicable law the filing of that malpractice claim effected at least a partial waiver of Jazz's privilege as to otherwise privileged communications with the defendants. Fuji and the Liquidation Trust appear to disagree as to the breadth of that waiver, which has given rise to potential motion practice over Fuji's ability to use in other proceedings a February 15, 2002 letter from Kaplan & Gilman to Jazz's then president and CEO (the "Kaplan Letter"). In the interest of avoiding unnecessary and costly motion practice, the undersigned agree as follows: (1) *Fuji may use the Kaplan Letter in the context of other proceedings;* (2) Fuji's use of the Kaplan Letter in other proceedings shall not effect a waiver of the attorney-client privilege to the extent such a privilege still exists in view of the pending malpractice case; and (3) the Liquidation Trust and Fuji reserve their rights as to any future disputes on the issue of the attorney-client privilege.

(Emphasis added.)

Obviously, the Kaplan–Jazz–Benun interaction and relationship are fundamental to analysis of the attorney-client privilege here at issue. The Benun–Jazz relationship is likewise important; in formal terms, it varied. He was president of Jazz from its inception in 1995 to March 31, 1997. Then he served as "consultant" but not officer or director, through his consulting corporation, JCB. On October 1, 2003 during the pendency of Jazz's Chapter 11, he again became chief operating officer. There is, however, no doubt in the court's mind that Benun controlled Jazz from its origin until he was rendered subject to certain bankruptcy controls, and eventually displaced in bankruptcy.

At the February 6, 2006 hearing on Fuji's application for access to Kaplan and Kaplan's files, Fuji's motion was conditionally denied (including denial of use *sub judice* of the February 15, 2002 letter). The condition was Benun's required waiver of an "advice-of-counsel" defense; if Benun chose to advance that defense, Kaplan would, within reason, become fair discovery game for Fuji; otherwise, Kaplan would be off limits based upon this Court's view of: (i) Benun's privilege; (ii) Jazz's limited waiver of its privilege through the malpractice case (privileged documents and testimony there to be walled off from Fuji here, without impairing either Kaplan's defense or Jazz's affirmative legal malpractice case); and (iii) the February 15, 2002 letter as being advice implicating *Benun's privilege*, not waivable by joint-privilege holder Jazz following unintended disclosure. Benun almost immediately waived advice of counsel as a defense. Fuji promptly moved—again on short notice—for reconsideration.

## II. *Specific Discovery Order Sought by Fuji.*

Fuji's proposed form of order submitted with the immediate motion is, in pertinent part, as follows:

[ ]. Jeffrey I. Kaplan be, and hereby is, directed to produce within five (5) days of the entry of this Order the following documents *prepared or distributed* from August 21, 2001 and through January 25, 2005 (for the purposes of this order, "Jazz" shall include Jack C. Benun ("Benun") in his role as officer or consultant of Jazz):

a. All documents referring or relating to advice given to Jazz … to the effect that any of Jazz's LFFPs were or could be infringing Fuji's LFFP patents.

b. All documents relating to Benun's knowledge that Jazz was or could be infringing Fuji's LFFP patents.

c. All documents exchanged with Jazz containing statements that Jazz's LFFPs were being made from shells of cameras not first sold in the U.S.

d. All documents which, in whole or in part, can be considered to impeach the truthfulness of statements, testimony or written representations of Benun.

e. All documents relating to Benun's knowledge that Jazz's LFFPs were being made from shells of previously refurbished cameras.

[ ]. Jeffrey I. Kaplan be, and hereby is, directed to appear for an oral deposition to be conducted by counsel for Fuji during the week of February 27, 2006, at a mutually agreed place and time and continue from day to day thereafter until completed, and said deposition shall be limited to events in the period from August 21, 2001 through January 25, 2005 concerning communications with Jazz, including Benun in his role as consultant or officer of Jazz, regarding the subject matters listed below:

a. Any advice given to Jazz that any of Jazz's LFFPs were or could be infringing Fuji's LFFP patents.

b. Matters relating to Benun's knowledge that Jazz was infringing Fuji's LFFP patents.

c. Any communication with Jazz that Jazz's LFFPs were being made from shells of cameras not first sold in the United States.

d. Bases for Kaplan's contention that Benun's testimony relating to the malpractice claim and/or other claims by Benun of good faith in other proceedings, were untrue.

e. Benun's knowledge that Jazz's LFFPs were being made from the shells of previously refurbished LFFPs.

(Emphasis supplied.) The precise meaning of the "prepared or distributed" language of the proposed form of order was said by Fuji's counsel to include communication *to or from* Kaplan, to or from "whichever actor was acting on behalf of Jazz," including Benun. Docket entry 76, 14:20–23.

Fuji identifies Benun—in his capacity as officer *or* consultant—as being "Jazz" "for purposes of this order." Fuji seeks Kaplan-held documents and Kaplan testimony as to infringement, Benun's knowledge of infringement, Benun's truthfulness and Benun's claims of good faith—all in a period when Kaplan actively represented Benun in infringement litigation with Fuji (District Court I, running from 1999 to trial on October 24, 2002 and final order/judgment on March 18, 2003), and the enforcement action, ITC–II (beginning September 24, 2002 and ending by notice dated January 24, 2005). And, unlike a case where a document log should be produced as a precursor to court review of potentially privileged material, the immediate discovery demand of Fuji specifies that which is *prima facie* privileged. *See* Point IV, A, *infra.*

### III. *The Weintraub and Bevill, Bresler & Schulman Cases—Fundamentally Different.*

This is *not* a case where a shift in corporate management (in or out of bankruptcy or in or out of a regulatory/receivership proceeding) has, up to this point, rendered the corporate entity-privilege holder adverse to employees or prior management. *Moore* has not effected a waiver of Jazz's attorney-client privilege so as to pursue Benun as former management.[6] Moore, in fact, seeks to preserve to the extent possible the privilege arising from Jazz's relationship with Kaplan.

In this posture, the matter *sub judice* differs from *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). *Weintraub* resolved a conflict among Circuits by holding that a trustee in bankruptcy may waive the corporate debtor's attorney-client privilege with respect to prepetition communications. The decision rested on the Supreme Court's conclusions: "the trustee plays the role most closely analogous to that of a solvent corporation's management," thus succeeding to management powers; and, vesting the trustee with the power to waive the privilege is not inconsistent with policies of the bankruptcy laws. 471 U.S. at 353–54, 105 S.Ct. 1986. A significant underpinning of the decision is "that vesting control over the attorney-client privilege in the trustee will facilitate the recovery of misappropriated corporate assets." 471 U.S. at 354, 105 S.Ct. 1986.

The theme of uncovering insider fraud or misdeeds is carried forward in *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120 (3d Cir.1986) (hereinafter *"BBS"*).

Moreover, we find that appellants' position is contrary to the public policies identified by the Supreme Court in *Weintraub*. The *Weintraub* Court found that permitting a bankrupt corporations' [sic] management to assert the corporation's privilege against the bankruptcy trustee would defeat the Bankruptcy Code's goal of uncovering insider fraud.... To provide a blanket privilege regarding all discussions of corporate matters on the basis of an assertion of personal privileges by the officers would prevent the trustee from investigating possible misconduct by the officers and permit the officers to "use the privilege as a shield against the trustee's efforts."

805 F.2d at 125 (citations to *Weintraub* omitted). However, the *BBS* opinion was quick to point out that while "officers ... do not have an attorney-client privilege with regard to communications made in their role as corporate officials," they "may assert their personal privilege as to matters not related to their role as officers of the corporation." *Ibid.* Moreover, the Third Circuit did not discount the potential for a joint defense privilege, even between a corporate officer and the entity (though in *BBS* no evidence supported the concept). 805 F.2d at 126.

While *BBS* broadly states certain propositions as to a corporate officer's role and privilege, it does so in the context of a *waiver* by the trustee who would actively investigate insider activity *and* without evidence that would establish a common defense or cause. The Jazz–Benun interfaces with counsel and *inter se* are quite different. Here, *Fuji* would have this court strip away Benun's privilege (as well

---

**6.** Matters could change; but, for the moment and as the immediate adversary proceeding moves toward trial, the current Moore/Jazz– Benun relationship does not appear to be overtly adversarial.

as that of Jazz), for *Fuji's benefit (not to benefit Jazz)*.

■ *BBS* reflects and quotes *Weintraub* (471 U.S. at 348, 105 S.Ct. 1986): "Displaced managers may not assert the privilege *over the wishes of current managers*, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties." (Emphasis added.) *See* 805 F.2d at 124. In the immediate case, development of distinctions between individual communication and "corporate communication" with the common attorney is problematic,[7] and the need to make such distinctions is questionable given the absence of a current adversarial relationship between Benun and Jazz. The presence here of one attorney representing, *in ongoing litigation,* both the corporate entity and the "officer" (really the controlling party), is a significant factual difference from *BBS*. Kaplan filed the answering pleading in District Court I for both Benun and Jazz as early as 1999, and then (while District Court I was ongoing and thereafter), actively represented *both* before the ITC. These years of co-representation (running from at least June 1999 through January 14, 2005), and continued representation of Benun alone into November 2005, must be contrasted with the short period of *consultation* (mere days) which was at the center of the *BBS* inquiry. In the final analysis,

"[w]hether there is a valid claim of privilege is decided on a case-by-case basis." *BBS*, 805 F.2d at 124 (*citing Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). Given the significant factual differences between *BBS* and the matter at bar, *BBS* cannot be a precedential model here.

## IV. *Benun's Attorney–Client Privilege Is At Stake in the Discovery Demand.*

### A. *Prima Facie Case for Privilege.*

Fuji's discovery demand goes to *Benun's* knowledge, state of mind and truthfulness, and infringement for which he would clearly be jointly responsible with Jazz. Its proposed form of order would have this court require Kaplan to produce "[a]ll documents which, in whole or in part, *can be considered* to impeach the truthfulness of statements, testimony or written representations of Benun"; and, as to infringement, two decretal paragraphs would order disclosure of Kaplan's "advice" that Jazz's LFFPs *were or could* be infringing Fuji's LFFP patents. (Emphasis added.) *Inter alia,* what Fuji seeks from Kaplan offends the purpose of the attorney-client privilege. To the extent that discovery is sought regarding Kaplan's *advice* to Jazz and Benun, the work product doctrine is implicated.[8] *See* FED. R. CIV. P. 26(b)(3).

---

7. Indeed, factually, the District Court in *BBS* deemed *privileged* early, pre-retention communications between corporate officers who were seeking both corporate and personal advice and possible retention, and counsel. It accepted the contention "that the corporate communications were indistinguishable from those related to ... personal legal problems...." 805 F.2d at 123. (This finding, *not* appealed, was the subject of a rather opaque comment in *dicta* by the Third Circuit. 805 F.2d at 125 n. 3.)

8. Kaplan's advice to Jazz or Benun during the pendency of District Court I and ITC–II (in-

cluding the run up to ITC–II following Fuji's demand of January 2002 for enforcement against both Jazz and Benun) was "work product" when given. In fact, the "re" line of Kaplan's February 15, 2002 letter is "Compliance with the Cease and Desist Order." There would have been no basis for discovery of such work product in and during the cases for which the work product was developed. Given the continuum of issues and parties from those matters into the immediate adversary proceeding, there would be merit in applying the work product bar *sub judice* to production of Kaplan's advice, given earlier.

■ The purpose of the attorney-client privilege is to encourage frank communication between client and attorney, thereby promoting "broader public interests in the observance of law and administration of justice." *Upjohn Co.*, 449 U.S. at 389, 101 S.Ct. 677. "The privilege forbidding the discovery and admission of evidence relating to communications between attorney and client is intended to ensure that a client remains free from apprehension that consultations with a legal adviser will be disclosed." *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir.1994). Under the sole Federal Rule of Evidence governing privileges (FED. R. EVID. 501 "General Rule") the privilege of a "witness" or "person... shall be governed by the principles of the common law" (unless State law provides the rule or decision). The guide to establishing a *prima facie* case for privilege outlined in *The New Wigmore* is instructive:

IF

1. The case is the right type of proceeding, AND

2. The person invoking the privilege has the power to do so, AND

3. The person is invoking the correct type of right, AND

4. The information in question amounts to a protected confidential communication,
 - Was there a "communication"?
 - If so, was it "confidential"?
 - If so, did it occur between properly related parties?
 - If so, was it incident or germane to the nature of the relation?

THEN there is a *prima facie* case that the privilege attaches, and the trial judge should uphold the privilege claim UNLESS

### THE METHODS FOR DEFEATING A PRIMA FACIE CASE FOR PRIVILEGE

5. There has been waiver of the privilege, OR

6. A special exception to the scope of the privilege is applicable.

Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges* § 6.3 (2002).[9] The Third Circuit has espoused a similar guide in *Rhone–Poulenc*, 32 F.3d at 862. *See In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir.1979), *citing United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950); *see also*, 8 Wigmore, *Evidence*, § 2292, at 554 (J. McNaughton rev. 1961) (1st ed.1904). It is noteworthy for

*See In the Matter of Grand Jury*, 211 F.Supp.2d 555, 559–61 (M.D.Pa.2001), *citing In re Ford Motor Co.*, 110 F.3d 954, 962 n. 7 (3d Cir.1997) for the proposition that documents reflecting an attorney's mental impressions are "afforded virtual absolute protection." 211 F.Supp.2d at 561. In addition, given the nature of Fuji's discovery demand, the work product bar to production could well transcend much of what is sought. Fuji's effort to utilize the Kaplan Letter of February 15, 2002 is a plain attempt to uncover advice, i.e., work product.

9. *See also* Edna Selan Epstein, *The Attorney-Client Privilege and the Work–Product Doctrine* (Chicago: The American Bar Association, 2001, 4th ed.), 45–262, and *Supplement* (2004), 9–55 (hereinafter "Epstein"); 5 *Moore's Federal Practice*, § 26.49 (Matthew Bender 3d ed.; Restatement (Third) of Law Governing Lawyers, § 68 ("Attorney–Client Privilege") (2005)); Paul R. Rice, *Attorney–Client Privilege in the United States* (The West Group, 1999), § 2.1 (hereinafter "Rice"); 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, §§ 503.10 through 5.03.15 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.1997).

present purposes that in the Third Circuit the attorney-client privilege protects communication passing *from the attorney* to the client as well as *vice versa.* *United States v. Amerada Hess Corp.*, 619 F.2d 980, 986 (3d Cir.1980).

Applying *The New Wigmore* syllogism to the facts of this case renders the discovery sought by Fuji *prima facie* privileged.[10] *Each* Kaplan-represented party thus has an attorney-client privilege. In addition, *under the specific circumstances of this case,* the Jazz–Benun interests and attorney-client privileges may readily be characterized as joint or common.

Kaplan was Benun's lawyer and confidant. He jointly represented Jazz with Benun—*under circumstances where Jazz and Benun were inseparable for District Court I infringement/damage and ITC–II enforcement action purposes.* Thus, Jazz's privilege and Benun's privilege were allied in joint defense and a general common interest compact serviced by a single lawyer. It is beyond dispute (and for good reason insofar as this court has been able to observe) that Fuji and the ITC have viewed Jazz and Benun as being essentially *identical* for liability and regulatory purposes. Their interests and jeopardy

have been intertwined over the entire period for which Fuji now demands Kaplan's insights.[11] Unless and until an overriding policy consideration develops—such as Benun and Jazz becoming adverse—their common interest should be favorably considered in upholding the privilege which is established *prima facie.*

### B. *The "Common Interest" Doctrine.*

 The "common interest" doctrine should be applied in this case. That doctrine is "an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party." Epstein at 196; *Cavallaro v. United States,* 284 F.3d 236, 249–50 (1st Cir.2002). Epstein points out that it is not an independent basis for privilege; the party resisting disclosure on a common interest theory must demonstrate that it has an attorney-client relationship with the attorney in question. The clearest context for application of the doctrine is one in which a single attorney represents two parties with a common interest;[12] each party's communication with the attorney is protected from disclosure to third parties. The privilege dissolves only when the two

10. Fuji's demands by their very nature go precisely to privileged communication. Fuji's proposed order is nothing short of a particularized template that would trace the essence of attorney-client confidences in the patent infringement and ITC enforcement representation. And, each element of the proposed order implicates *Benun.*

11. This is the case, notwithstanding the clear separation of Jazz (under Moore's control) and Benun; prepetition Jazz was Benun's invention and *alter ego;* post-petition, though no longer in that status, the Jazz–Benun interests and jeopardy remained melded at least through the January 14, 2005 award in ITC–II.

12. The doctrine is also invoked where multiple attorneys represent multiple clients with a

common interest. By 2004 Epstein deemed the "common interest" doctrine "in serious need of rethinking" because "it confounds two totally separate contexts," representation of criminal defendants by one or more attorneys and representation of corporations and their principals or fiduciaries. Epstein at 31–47 (2004 Supp.). The term "common interest" here includes (as per Epstein), concepts of "common or joint legal defense," "commonality of legal interests" and others. Rice uses representative terms such as "joint clients" (§ 9:67) (single attorney and multiple clients), and "participants in common defense" (§ 9:68) (multiple attorneys and multiple clients). Overall, commentators and courts use many of the foregoing terms and concepts somewhat interchangeably.

parties having the original common interest become adversaries. Epstein, at 196–97, *citing* 8 WIGMORE, Evidence § 2312 (1992).

Rice's concept of the "joint client" exception (i.e., one attorney represents two or more clients in the same matter) is as follows:

> Provided there is a community of interests between the joint clients, their communications with shared counsel on the matters of common interest may be protected by the attorney-client privilege. ... [E]ach joint client's communications with the attorney may be shared among the others without destroying either their confidentiality or the privilege protection premised upon it.
>
> Communications between joint clients themselves are also protected when their purpose is to facilitate more effective representation, that is, when they are intended for ultimate transmission to counsel for the purpose of obtaining legal advice.
>
> Because these privilege claims are held in common, it is generally agreed that none of the joint clients may waive that privilege protection without the consent of the others.[13]

Rice § 9:67 (internal references omitted). *See North River Ins. Co. v. Philadelphia Reinsurance Corp.*, 797 F.Supp. 363, 366 (D.N.J.1992), *rev'd o.g.*, 52 F.3d 1194 (1995) (reinsurer was denied discovery of documents which the reinsured and its attorney prepared for arbitration). *See also United States v. Moscony*, 927 F.2d 742, 753 (3d Cir.1991); 6 *Moore's Federal Practice*, § 26.49[1] (Matthew Bender 3d ed.); and 1 Kenneth S. Broun et al., *McCormick on Evidence*, § 91 at 335–36 (4th ed.1992),

cited in *Federal Deposit Ins. Corp. v. Ogden Corp.*, 202 F.3d 454, 463 (1st Cir.2000). "The term 'common interest' typically entails an identical (or nearly identical) legal interest as opposed to a merely similar interest." *Ogden*, 202 F.3d at 461, *citing McMorgan & Co. v. First Cal. Mortgage Co.*, 931 F.Supp. 699, 701 (N.D.Cal.1996) and *NL Indus. v. Commercial Union Ins. Co.*, 144 F.R.D. 225, 230–31 (D.N.J.1992).

Benun is entitled to resist the disclosure by Kaplan as demanded by Fuji; the common interest doctrine applies *sub judice*.

### C. Jazz Cannot Waive Benun's Privilege.

■ *Interfaith Housing Delaware, Inc. v. Town of Georgetown*, 841 F.Supp. 1393, 1402 (D.Del.1994) held as follows:

> [W]hen one of two or more clients with common interests waives the attorney-client privilege in a dispute with a third party, that one individual's waiver does not effect a waiver as to the others' attorney-client privilege.

841 F.Supp. at 1402. In that case several town council members had changed their vote to impose conditions on the construction of a low-income housing project. The sponsors sued the town and its council members individually. When one council member volunteered in a deposition that he had added a particular stipulation "on the advice of counsel" (meaning the town solicitor), the sponsors sought a declaration that all town council members had waived any attorney-client privilege with respect to the authority of the town to impose conditions on the construction. 841 F.Supp. at 1395. In determining that *both* the town and the town council members individually were clients of the town solicitor, the individual members were de-

---

**13.** This statement is overbroad, given developing precedent that one client may waive as to *his/her* privilege, though not as to the bal- ance of the common interest group. *See* Rice § 9:3 (2005 Supp.).

scribed as "agents of the Town Council and share common interests with the Town Council regarding the proposed ... development." 841 F.Supp. at 1397.

It was held that the deposed council member voluntarily waived *his* attorney-client privilege with respect to the limited subject matter of the single stipulation to which he testified; he could not waive the attorney-client privilege either for the town or for other council members. 841 F.Supp. at 1399–1400. The nonwaiving individual council members were beneficiaries of the " 'common interest rule' " or " 'joint defense privilege.' " 841 F.Supp. at 1400.

*Interfaith Housing* cites *Construction Unlimited Corp. v. Woodfield,* 1992 WL 157511, at *2 (Conn.Super.1992) ("holding that when an attorney represents multiple clients and a dispute between the attorney and one client later occurs, 'there is a waiver of the privilege, but only by the client asserting the liability' ") (parenthetical as quoted in *Interfaith Housing,* 841 F.Supp. at 1401). To the same effect, *see CFS–Related Securities Fraud Litigation,* 223 F.R.D. 631 (N.D.Okla.2004) (relying on *Interfaith Housing* ).

D. *In the Matter of Grand Jury ("Grand Jury 2001").*

*Grand Jury 2001,* 211 F.Supp.2d 555 (M.D.Pa.2001), like *Interfaith Housing,* is a single attorney case, but involved issues of joint representation of a corporation and a corporate officer (the "CEO"). The attorney had represented both the entity and the CEO in an earlier litigation; he was then called before the grand jury to testify about conversations relating to settlement of that litigation.[14] *The corporation had waived its attorney-client privi-*

*lege* by the time the attorney's testimony was demanded before the tribunal. Nevertheless, the CEO's privilege was upheld (even as to the CEO's statements to a corporate vice president who then relayed them to the attorney). 211 F.Supp.2d at 559.

The court reiterated that "[t]he attorney-client privilege protects confidential communications made to an attorney in his or her professional capacity in those instances in which a strict relationship between the attorney and the client exists." 211 F.Supp.2d at 558–59, referring to *Haines v. Liggett Group Inc.,* 975 F.2d 81, 94 (3d Cir.1992). Moreover, joint defense was recognized by the court as augmenting the privilege as follows: "[t]his protection extends to communications between different persons or separate corporations when the communications are 'part of an on-going and joint effort to set up a common defense strategy.' " 211 F.Supp.2d at 559, *citing Eisenberg v. Gagnon,* 766 F.2d 770, 787 (3d Cir.1985). The party asserting the joint privilege must demonstrate that: "(1) the communications were made in the course of a joint defense; (2) the statements were designed to further the effort; and (3) the privilege has not been waived." *Ibid., citing Haines,* 975 F.2d at 94, and *BBS,* 805 F.2d at 126.

The court specifically decided that by waiving its attorney-client privilege the corporation could not "unilaterally waive the entire joint defense privilege." Since the CEO had not waived his privilege, statements by him to the attorney and the vice president concerning the earlier litigation were protected, and any such statements by the CEO to the vice president,

---

14. In a second case preceding the grand jury session, the attorney had represented the corporation (and others) but not the CEO; predictably, privilege issues as to this second case were resolved differently than in the joint defense context of the first case.

later transmitted by the vice president to the attorney, were also protected. *Ibid.*

Though the corporate context and the single attorney representation in *Grand Jury 2001* parallel the immediate case, the following are distinguishing factors which would seem to enhance *Benun's* privilege relative to that of the CEO in the precedential case:

- Jazz has not issued any form of broad waiver of its privilege (but for the obviously reluctant waiver as to the Kaplan Letter);

- *Grand Jury 2001* makes no finding that the corporation was either the *alter ego* of or was controlled by the CEO (whereas *sub judice* at the time of the February 15, 2002 Kaplan Letter Jazz was Benun's *alter ego* and otherwise controlled Jazz at least up to the petition filing date);

- *Grand Jury 2001* makes no finding of a continuum of common interest and jeopardy as exists with Jazz and Benun throughout the period for which discovery is sought (indeed, the CEO in *Grand Jury 2001* was not a party to subsequent litigation which interdicted along the time line between the case in which joint defense was established and the grand jury session);

- The discovery demand *sub judice* is a particularized template for disclosure of that which was and continues to be key, sensitive and privileged as to Benun's defense (whereas in *Grand Jury 2001* the disclosure demand is substantially less specific and not necessarily *per se* at the heart of the attorney-client relationship); and

- *Grand Jury 2001* involved a criminal investigation, not a civil action seeking, essentially, Fuji-centered business benefits.

*Inter alia, Grand Jury 2001* is positive precedent for the protection of Benun's attorney-client privilege; in fact, Benun's case is significantly stronger.

### E. *Eisenberg v. Gagnon.*

■ The joint defense or common interest corollary to the attorney-client privilege remains effective even if the interests of the privilege holders begin to diverge without becoming explicitly adversarial. *Eisenberg v. Gagnon,* 766 F.2d 770, 787 (3d Cir.1985), (precedent acknowledged positively in *BBS,* 805 F.2d at 126, and throughout *Grand Jury 2001* ), involved an action for securities law violations and common law negligence concerning the marketing of tax shelters. Multiple attorneys and their clients were engaged in joint defense. An attorney, Wasserstrom, who was the primary proponent of the scheme, his law firm, and the law firm's insurer, each had separate counsel assigned by the law firm's insurer. At issue was production of correspondence between a principal of the law firm and the insurer's attorney, correspondence which contained the principal's position that information known to Wasserstrom should have been disclosed to investors (as well as that principal's ideas for certain trial strategy). 766 F.2d at 787. In disallowing production, the court observed that the parties' interests "largely coincided" and therefore:

[T]he correspondence was privileged, since it is best viewed as part of an ongoing and joint effort to set up a common defense strategy between a defendant and an attorney who was responsible for coordinating a common defense position. *Communications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client with some adverse interests....*

This situation is not governed by those cases holding there is no privilege for communications with another's attorney

where the parties [sic] interests are completely adverse and it is clear that the statements were not made in the expectation that the relationship was confidential. . . .

766 F.2d at 787–88 (emphasis added; internal citations omitted).[15]

F. _Benun's Privilege in the February 15, 2002 Letter and Other Communications Where He Was Not the Specified Recipient._

■ No one case answers the comprehensive question: Does Benun have an attorney-client privilege as to the Fuji-specified documents and testimony, even where cast by Fuji as communication between _Jazz_ and _Kaplan?_ Nevertheless, _Eisenberg_ and similar common interest insurance coverage cases are instructive. Suppose in _Eisenberg_ the insurer's attorney had _responded_ to the "non-client" law firm principal. It is logical to assume that the _insurer_ (i.e., that the corresponding lawyer's own client) would have a privilege to assert in the communication to a common interest party.

Single attorney cases such as _Interfaith Housing_ and _Grand Jury 2001_ bolster this conclusion. In the current single attorney scenario—where Fuji, the ITC and others have viewed Jazz as Benun's _alter ego_— acknowledging _Benun's_ privilege in certain key sensitive Kaplan–Jazz communications as well as Kaplan–Benun communications, is justified. Certainly Jazz and Benun were joined in defense against Fuji or the ITC or a combination of them for the entire period focused on by the Fuji discovery demand. Put in functional terms, Benun, as the putative inducer of infringement, and Jazz, as his potentially infringing medium, cannot be separated from their joint counsel's advisory as to compliance with or offense to a persisting injunctive order. Kaplan, knowing of both Benun's and Jazz's jeopardy in violating the Cease and Desist Order, issued "how to" counseling on February 15, 2002 (and presumably at other times). Jazz, as the operating medium, was the nominal recipient of such communication, but not to the exclusion of Benun's interests and privilege.[16]

V. **Benun Has Not Put Kaplan's Advice at Issue Sub Judice, Nor Has Jazz's Malpractice Case Waived Either Jazz's or Benun's Privilege Generally.**

■ "There is authority for the proposition that a party can waive the attorney client privilege by asserting claims or defenses _that put his or her attorney's advice in issue in the litigation._" _Rhone–Poulenc_, 32 F.3d at 863 (emphasis added). _Rhone–Poulenc_, not a legal malpractice case but rather a drug liability and insurance coverage case, explains:

Thus, in a patent suit, where an infringer is alleged to have acted _willfully_, the advice of the infringer's lawyer may be relevant to the question of whether the infringer acted with a willful state of mind. _However, the advice of the infringer's counsel is not placed in issue,_

---

**15.** _See Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.,_ 559 F.2d 250 (5th Cir. 1977) (attorney was not allowed to proceed against a _codefendant of a former client_ where the subject matter of the immediate controversy was substantially related to matters in which the attorney was previously involved and where confidential exchanges of information took place between the various codefendants in preparation of a joint defense).

**16.** This is not to say that all Jazz–Kaplan privileged communication is necessarily subject to Benun's privilege; however, Fuji has defined a particular discovery program in its proposed form of order; _that program_ is by its nature within the scope of the co-privilege in the specific circumstances of this case.

*and the privilege is not waived, unless the infringer seeks to limit its liability by describing that advice and by asserting that he relied on that advice.* When the advice of counsel is asserted as a defense by the infringer, the patent owner may explore facts that would make it more probable than not that the infringer did not rely in good faith on that advice, including for example, what the advice was, when it was given, whether the alleged infringer's conduct suggests he had relied on the advice and whether he had knowledge of facts that would have led him to believe it would not be reasonable to rely on that advice.

32 F.3d at 863 (emphasis added) (referencing *Underwater Devices Inc., v. Morrison–Knudsen Co.,* 717 F.2d 1380 (Fed.Cir. 1983)).[17] In *Rhone–Poulenc,* the court found that the plaintiffs did not waive the attorney-client privilege by suing for coverage or by putting their state of mind in issue, that is, they did not "interject[ ] the advice of counsel as an essential element of a claim" in their case. 32 F.3d at 864. *See also Remington Arms Co. v. Liberty Mut. Ins. Co.,* 142 F.R.D. 408, 413 (D.Del. 1992) (decrying the degeneration of the attorney-client privilege into a "general balancing test." *Id.* at 414). In the immediate discharge-related adversary proceeding, Benun has specifically waived advice of counsel allegations alluded to in earlier discovery and/or motion practice. (The actual assertion related to an historic event involving Benun and another camera company—not Jazz—and another attorney—not Kaplan.) Therefore, Benun has not "put his . . . attorney's advice in issue" *sub judice.*

As to Jazz's malpractice case against Kaplan, Fuji would posit that Jazz's actions in District Court II are sufficient to erode *all* privilege as to Kaplan's testimony and files. By extension, Fuji would argue that Benun's declaration regarding his request that the "new law" contention be advanced in District Court I denies Benun the attorney-client privilege.[18] But these arguments overgeneralize. Surely *Kaplan* can, within the bounds of ethical propriety, defend himself against the Moore/Jazz malpractice claims by exposing *in that case* otherwise privileged matter; in so doing, he is permitted to respond specifically to the Benun declaration.

The Rules of Professional Conduct of the American Bar Association, as revised by the New Jersey Supreme Court and

---

**17.** The Third Circuit in *Rhone–Poulenc* disagreed with cases which deemed the attorney-client privilege waived when the client's state of mind with regard to legal advice, rather than the legal advice, was in issue:

> Some decisions have extended the finding of a waiver of the privilege to cases in which the client's state of mind may be in issue in the litigation. These courts have allowed the opposing party discovery of confidential attorney client communications in order to test the client's contentions. . . . While the opinions dress up their analysis with a checklist of factors, they appear to rest on a conclusion that the information sought is relevant and should in fairness be disclosed. *Relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged,*

> *and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue.*

> 32 F.3d at 864 (emphasis added) (internal citations omitted).

**18.** It is apparent that Jazz was Benun's *alter ego* from the inception of Jazz to at least the petition filing date of May 20, 2003; their common interest in defending against infringement claims and common jeopardy for infringement penalties continued for some time thereafter (note the ITC–II award of January 14, 2005, assessing a penalty through December 12, 2003 against *Benun* as Jazz's equivalent). It is equally apparent that Jazz-in-liquidation is under the control of Moore and independent of Benun.

adopted by the District Court of New Jersey pursuant to L. Civ. R. 103.1(a), limit the extent to which an attorney may disclose attorney-client privileged information in the attorney's own defense, after the attorney's conduct has been placed in issue. RPC 1.6 provides in relevant part:

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b), (c), and (d). . . .

(d) A lawyer may reveal such information *to the extent the lawyer reasonably believes necessary:* . . .

(2) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, or to establish a defense to a criminal charge, civil claim or disciplinary complaint against the lawyer based upon the conduct in which the client was involved . . . . (Emphasis added.)

Consider the following statement in *Greig v. Macy's Northeast, Inc.*, 1 F.Supp.2d 397, 401 (D.N.J.1998): [19]

Although a former client certainly has to accept the fact that . . . confidences will be revealed to some extent once she asserts a claim of malpractice against her former attorney, she should not be forced into a situation where these confidences are revealed to her adversaries, who are still involved in pending litigation and whose knowledge of her confidences would cause her the greatest harm.

In the immediate matter Benun is not suing Kaplan. Nevertheless, Kaplan can-

not be handcuffed in his defense to Jazz's malpractice claims; hence the clear solution is to allow Kaplan's limited disclosures (the scope of which can only be a matter of speculation at this time) in District Court II—not in *Fuji v. Benun.* To give Fuji, Benun's constant antagonist, license to hunt for Kaplan's insights and advice derived from representation of Benun in the patent infringement case (District Court I) and the enforcement proceeding (ITC–II) "would cause . . . the greatest harm" to Benun. And, it would abrade both the attorney-client privilege and the intent of the RPCs.

## VI. *Benun's Privilege Not to Have the February 15, 2002 Letter Disclosed Cannot Be Waived by Jazz's Inadvertence and Subsequent Demurrer.*

Moore, as Liquidating Trustee of Jazz, was required to assemble the books and records of that sizeable enterprise, and move them *en masse* to smaller quarters (replacing for reasons of cost and efficiency the abandoned Jazz operating facility). Seventy-five boxes of documents and massive hard drive data was assembled by the Trustee for safeguarding. Moore pointed out to this court at the hearing on this discovery motion that the cost of "cleansing" all records was prohibitive. Moore, a seasoned professional fiduciary, is correct. Trustees arriving on the scene of a corporate demise must do the best they can to balance a variety of interests; Moore, in particular, has been litigating in District Court II, settling claims (including Fuji's high dollar claim settlement where the concluding deal was not quite "buttoned up" at the time of the

---

19. *Greig* involved a variation of a "side-switching" attorney. Weiner initiated a civil rights case for plaintiff Greig. They had a falling out and during the pendency of her civil rights case, Greig sued her own lawyer for malpractice within that case; Weiner retained an attorney to defend the malpractice claim who was from the same firm as the attorney defending the civil rights case. The *firm* was disqualified as to *all* representation.

December 2005 document review session), and otherwise attempting to maximize assets and hold down expenses. In this environment, Moore's effort at a blanket accord with Fuji's counsel that document inspection would not serve as a waiver of the attorney-client privilege was practical. Unfortunately, there was a difference in view as to the prediscovery accord. However, the January 23, 2006 letter agreement certainly evidences Moore's perspective that the attorney-client privilege was and should continue to be available to *Jazz*. It also serves as *Fuji's* acknowledgment that the Kaplan Letter was inadvertently disclosed. "The inadvertent production of a privileged document is a specter that haunts every document intensive case." *Federal Deposit Ins. Corp. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479, 479 (E.D.Va.1991).[20]

It is also noteworthy that Fuji sought access to Jazz records in its case against *Ribi Tech*, not in this adversary proceeding. Of course, one could connect dots between Benun and Ribi Tech; however,

Benun's counsel on the immediate motion argued forcefully that *he* was not alerted to the document review session of December 2005, and that as a minimum he should have had an opportunity to either oppose the discovery or be present when Fuji's counsel conducted the inspection.

Under these circumstances, *Benun* should retain his attorney-client privilege in Kaplan's letter of advice (as to the sensitive subject of "Compliance with the Cease and Desist Order" and at a critical point in time in Kaplan's representation of Jazz and Benun). As addressed earlier, Moore/Jazz cannot waive the co-privilege holder's rights. Moreover, Moore was obviously caught in a bind, never intended any waiver of privilege initially, and "served up" the Kaplan Letter only to preserve Jazz's broader privilege and assets. Therefore, though not specifically an issue *sub judice*, it would appear that *Jazz* has a substantial argument that it has preserved its privilege vis-à-vis *Fuji* as to all attorney-client communications except the Kaplan Letter.[21] Indeed, as Rice

---

**20.** *See generally* Ken M. Zeidner, "Inadvertent Disclosure and the Attorney–Client Privilege: Looking to the Work–Product Doctrine for Guidance," 22 Cardozo L. Rev. 1315 (March 2001); *Redland Soccer Club, Inc. v. Dep't of the Army of United States*, 55 F.3d 827, 856 (3d Cir.1995) (inadvertent disclosure of documents did not waive the privilege in them; "balancing test" to support waiver rejected); *Transamerica Computer Co. v. Int'l Bus. Machines Corp.*, 573 F.2d 646, 651 (9th Cir.1978) (no waiver of privilege in documents produced inadvertently during a compressed discovery schedule); *Ciba–Geigy Corp. v. Sandoz Ltd.*, 916 F.Supp. 404, 411 (D.N.J.1995).

**21.** Inadvertence has led to practical acquiescence by the trustee as to the February 15, 2002 letter (only); Jazz has otherwise expressed its intention to maintain and maximize its attorney-client privileges. *Contrast Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414 (3d Cir.1991). In *Westinghouse* the Third Circuit declined to adopt the doctrine of "selective waiver" put

forth by the Eighth Circuit in *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978) (*en banc*) and rejected by the District of Columbia Circuit in *Permian Corp. v. United States*, 665 F.2d 1214 (D.C.Cir.1981). "Selective waiver" would allow a client to disclose attorney-client privileged information to one entity, then reassert the privilege against other entities. The Third Circuit in *Westinghouse* approved the following reasoning from *Permian:*

> The client cannot be permitted to pick and chose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit.... The attorney-client privilege is not designed for such tactical employment.

951 F.2d at 1425, *quoting* 665 F.2d at 1220. However, *Westinghouse* distinguished between "selective waiver" and "partial waiver" (951 F.2d at 1423 n. 7); at most, Moore has

points out (§ 9.3): "Increasingly, in many contexts, confidentiality is being treated as a condition precedent to the creation of the privilege, but not a necessary condition for its continuation."

## VII. *Conclusion.*

This court concludes as follows:

1. Fuji's discovery demand goes to the heart of the attorney-client relationship. It seeks disclosure of the longtime attorney's advice proffered during the pendency of litigation and enforcement proceedings. It would have that disaffected attorney reveal that which he considers would "impeach the truthfulness of statements, testimony, or proceedings" of Benun, as well as Benun's "good faith in . . . proceedings." Jazz's infringement and Benun's knowledge of it, as well as other key and sensitive testimony is sought in a deposition of Kaplan. All of the discovery demanded by Fuji through Kaplan is *prima facie* privileged.

2. Jazz, now controlled by Trustee Moore, has struggled to maintain (*not waive*) its attorney-client privileges. It has not joined in Fuji's current discovery effort. There is no overt adversarial relationship between Jazz/Moore and Benun at this time. Therefore, there is no policy need to strip Benun of his attorney-client privilege as to Kaplan's insights, advice and files, vis-à-vis Jazz.

3. Benun and Jazz had been inseparable in their defense of District Court I (infringement/damages) and ITC–II (enforcement of the Cease and Desist Order); their joint representation by Kaplan establishes the privilege of each in matters of common interest.

4. Jazz was Benun's *alter ego* at least to May 2003, and their jeopardy for Jazz's patent infringement has been joint throughout the period for which discovery is sought. Moreover, Jazz's infringement and Benun's inducement of Jazz to infringe, central to District Court I and ITC–II, bear directly on the immediate case.

5. Jazz cannot waive Benun's privilege in the key and sensitive disclosure that Fuji seeks; Benun's privilege, under the circumstances of this case and at least insofar as the Fuji discovery demand details, extends to Kaplan's communications with Jazz officers other than Benun. Benun's privilege specifically extends to the February 15, 2002 Kaplan Letter dealing with "Compliance with the Cease and Desist Order." This letter of advice and attorney opinion is also work product and as such, should be protected from discovery.

6. Jazz's initiation of a legal malpractice suit against Kaplan (and Benun's support thereof with a statement) does not waive Benun's attorney-client privilege in the Fuji-sought disclosure *sub judice.*

Privilege issues arising out of the attorney-client relationship are to be decided on a case-by-case basis. The conclusions in this case are, of course, a function of the specific and complex history of the Jazz–Benun–Fuji dispute. That began before 1999 and continues into the immediate adversary proceeding. Until recently, Kaplan was Benun's principal advocate and defender. Benun and Fuji battle on, with

---

acceded to a partial waiver (i.e., Kaplan's letter). *See In re Hechinger Inv. Co. of Del.,* 303 B.R. 18, 24 (D.Del.2003). Moreover, it is clear to this court that Moore, laboring diligently under circumstances typifying the document and litigation-intensive environment

that trustees are thrust into, was not engaging in the "tactical employment" of the privilege. In any event, there was no disclosure, selective or otherwise, by *Benun* and hence there would be no conflict with case law in preserving *Benun's privilege.*

intent to infringe now being the central issue. If, in the latter days of this odyssey, Kaplan should be allowed to become allied with Fuji and serve both as a source of inside information and a witness bearing on his longtime client's credibility and good faith, the essence of the attorney-client privilege shall have been sacrificed. Fuji must prove its case as to Benun's intent to induce infringement (if it can) by evidence adduced other than through the attorney who engineered the Jazz–Benun defense to ITC–II and who filed the answering pleading for both of them in District Court I.

Fuji's motion is denied. The court will issue its implementing order.